IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GIORGI BULEISHVILI,** | : | CIVIL ACTION NO. 1:20-CV-607 |
| Petitioner | : | (Chief Judge Conner) |
| v. | : | |
| **ANGELA HOOVER, in her Official Capacity as Warden of the Clinton County Correctional Facility,**[1] | : | |
| Respondent | : | |

## MEMORANDUM

Petitioner Giorgi Buleishvili is a civil detainee in the custody of the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE"). Buleishvili brings this habeas action pursuant to 28 U.S.C. § 2241 seeking immediate release from ICE custody based on his concern that the COVID-19 virus[2] may reach the county correctional facility where he is presently detained. For the reasons that follow, we will deny Buleishvili's petition.

---

[1] As the person with custody over Buleishvili, Warden Hoover is the only proper respondent in this case. See Rumsfeld v. Padilla, 542 U.S. 426, 434-35 (2004) (quoting 28 U.S.C. § 2242).

[2] The COVID-19 virus is also known as "severe acute respiratory syndrome coronavirus 2" and "SARS-CoV-2." WORLD HEALTH ORGANIZATION, NAMING THE CORONAVIRUS DISEASE (COVID-19) AND THE VIRUS THAT CAUSES IT, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/technical-guidance/naming-the-coronavirus-disease-(covid-2019)-and-the-virus-that-causes-it. We refer to the virus herein as "the COVID-19 virus" and to the disease it causes as "COVID-19."

I. **<u>Factual Background & Procedural History</u>**

Buleishvili is a 44-year-old citizen of the country of Georgia. (Doc. 1 ¶ 9). He entered the United States in April 2003 as a nonimmigrant visitor. (Doc. 5-1 ¶ 19). Buleishvili indicates that he had "spinal surgery" in 2004 and otherwise "has a long medical history," but his petition and attached exhibits provide no additional detail. (<u>See</u> Doc. 1 ¶ 33). On November 17, 2012, Buleishvili adjusted to the status of lawful permanent resident. (Doc. 5-1 ¶ 19). His fiancé and three children are all United States citizens. (Doc. 1 ¶ 33).

According to the declaration of Joshua Reid, Assistant Field Office Director for Enforcement and Removal Operations in ICE's Philadelphia Field Office ("AFOD Reid"), Buleishvili was convicted in July 2017 in the Southern District of New York for conspiracy to commit fraud, wire fraud, and health care fraud. (Doc. 5-1 ¶ 19). Buleishvili received a 34-month prison sentence for his role in the conspiracy "that fraudulently billed Medicare and/or Medi[caid] from 2010 through 2014 of approximately 67.8 million dollars, of which approximately 26.2 million was paid." (<u>Id.</u>) A total of $13,795,269 was "directly attributable" to Buleishvili. (<u>Id.</u>) Buleishvili was ordered removed under 8 U.S.C. § 1227(a)(2)(A)(iii) for having been convicted of an "aggravated felony," and, at the conclusion of his federal sentence, he was released from prison to ICE custody pending removal from the United States. (<u>See</u> <u>id.</u>)

Buleishvili is currently detained at Clinton County Correctional Facility ("CCCF"). (<u>See</u> Doc. 1 ¶ 9; Doc. 5-1 ¶ 19). According to AFOD Reid, CCCF has taken several steps to prevent introduction of the COVID-19 virus into the facility.

2

(Doc. 5-1 ¶¶ 9-18, 21, 23). All CCCF staff and vendors are screened for COVID-19 symptoms before entering, and CCCF limits visitation to noncontact professional visits. (Id. ¶¶ 10, 14, 16). New detainees are screened upon intake for COVID-19 symptoms and potential exposure to the virus. (Id. ¶ 9). Symptomatic detainees are isolated and tested for the virus, and asymptomatic-but-exposed detainees are placed in "cohorts"[3] for the duration of the incubation period. (Id. ¶ 11). Staff have designated specific housing units for quarantining detainees with suspected or confirmed cases of COVID-19. (Id. ¶ 18).

CCCF has also implemented practices to lessen the risk of transmission within the facility should a detainee or staff member become infected. AFOD Reid explains that, in response to the COVID-19 pandemic:

> All staff are required to wear masks when in the secure portion of the facility. All detainees have been provided with a minimum of 2 washable masks and are encouraged to utilize the masks at all times. [CCCF] now requires that transport and intake officers be properly fitted for and wear N95 masks. Employees in intake and accompanying inmates outside the facility are required to wear goggles or safety glasses. Upon removal of their masks, employees are required to immediately wash their hands. Prison personnel are broadcasting COVID-19 information from the Pennsylvania Department of Health and Centers for Disease Control and prevention information to all detainees in multiple languages over their internal closed-circuit broadcast system. Toilet paper is readily available to all detainees.

---

[3] According to AFOD Reid, "cohorting" is an "infection prevention strategy" that involves housing asymptomatic-but-potentially-ill detainees together during a virus's incubation period. (Id. ¶ 11). Cohorting lasts for the entire duration of the incubation period—14 days in the case of the COVID-19 virus. (Id.) When an individual in a cohort exhibits symptoms, they are referred to a medical provider for further evaluation. (Id.)

3

(Id. ¶ 21(a)).  CCCF has increased cleaning and sanitization, has placed 20 hand sanitizer stations throughout the facility for staff and detainee use, and has begun educating staff and detainees on proper handwashing techniques, hand hygiene, and covering coughs.  (Id. ¶¶ 13(a), 17).

AFOD Reid reports that his office has implemented federal guidance for reassessing the continued detention of individuals "potentially being at higher risk" for serious complications from COVID-19.  (Id. ¶ 23).  He states that Buleishvili does not appear on ICE's "chronic care list," but that his case was nonetheless reviewed as part of this reassessment process.  (Id. ¶¶ 19, 23).  Reviewing officials determined that, because Buleishvili is a flight risk subject to mandatory detention, release was not appropriate.  (See id.)

On April 13, 2020, Buleishvili filed a counseled emergency petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241.  We ordered expedited briefing, and respondent filed a brief opposing Buleishvili's petition on April 17, 2020.  In lieu of a reply, Buleishvili's counsel submitted a declaration from Buleishvili stating that he is "worried" he will contract the COVID-19 virus; that there are "a lot of people in [his] bunk"; that on April 10, he experienced a cough, "very bad bloody no[]se," and a stomachache, and that he has since felt constipated; and that on April 16, he "fe[lt] like . . . there is something in [his] lungs which is preventing [him] from breathing properly."  (Doc. 6-1 ¶¶ 1-5).  Buleishvili reports that he is being treated by the medical unit which continues to provide him with Tylenol.  (Id. ¶¶ 2, 4).  Just this afternoon, respondent supplied medical records from CCCF which reflect that Buleishvili was treated on February 19, 2020, for symptoms unrelated to respiratory

4

illness and that, during his medical visit on April 10, Buleishvili had a temperature of 97.8 degrees and a 100% oxygen saturation rate. (Doc. 7-1 at 1-2).

## II. Legal Standard

A federal district court may issue a writ of habeas corpus if a petitioner demonstrates that they are "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). As the Third Circuit Court of Appeals has explained: the "core" purpose of habeas corpus "has traditionally been to 'inquire into the legality of detention, and the only judicial relief authorized was the discharge of the prisoner or his admission to bail, and that only if his detention were found to be unlawful.'" Leamer v. Fauver, 288 F.3d 532, 540 (3d Cir. 2002) (citation and internal quotation marks omitted). Thus, habeas has been found to be the proper vehicle for challenges to "the fact or length of confinement," Tedford v. Hepting, 990 F.2d 745, 748 (3d Cir. 1993) (quoting Preiser v. Rodriguez, 411 U.S. 475, 494 (1973)), or the "execution" of that confinement, see Woodall v. Fed. Bureau of Prisons, 432 F.3d 235, 241-42 (3d Cir. 2005) (quoting Coady v. Vaughn, 251 F.3d 480, 485 (3d Cir. 2001)) (citing United States v. Eakman, 378 F.3d 294, 297 (3d Cir. 2004)). When a petitioner seeks immediate release from custody, the "sole federal remedy" lies in habeas corpus. See Preiser, 411 U.S. at 500.

## III. Discussion

Buleishvili asks this court to order his immediate release from ICE custody based on his concern that he may become exposed to and contract the COVID-19 virus while detained at CCCF. Respondent disputes whether Buleishvili's claims are cognizable in habeas, whether his claims have any merit, and whether release is

5

an appropriate remedy.  We begin with respondent's threshold contention as to the scope of habeas corpus relief.

### A. Scope of Habeas Corpus Relief

Respondent first questions our ability to grant the relief requested by Buleishvili pursuant to Section 2241.  Respondent contends that Buleishvili's petition raises civil rights claims which must—and can only—be brought in a civil action under 42 U.S.C. § 1983.  (See Doc. 5 at 8-9 (quoting Preiser, 411 U.S. at 490, 499; Leamer, 288 F.3d at 542, 543)).

We thoroughly explored this argument in Camacho Lopez v. Lowe, No. 3:20-CV-563, 2020 WL 1689874 (M.D. Pa. Apr. 7, 2020).  We observed, as an initial matter, that while Preiser and Leamer hold that Section 1983 provides no remedy for what is fundamentally a habeas claim, neither decision forecloses a remedy in habeas for what may fundamentally be a civil rights claim.  See Camacho Lopez, 2020 WL 1689874, at *4-5. As for whether conditions-of-confinement claims are cognizable in habeas, we canvassed existing Supreme Court and Third Circuit precedent to conclude that, in narrow circumstances, they are.  We noted that our court of appeals has signaled that an "extreme" conditions-of-confinement claim can support habeas relief.  Id. at *5 (quoting Ali v. Gibson, 572 F.2d 971, 975 n.8 (3d Cir. 1978), superseded by statute on other grounds as stated in Callwood v. Enos, 230 F.3d 627, 633 (3d Cir. 2000)).  And we further noted its holding that claims that go to the very "execution" or "carrying out" of a period of confinement, even if they do not oppugn the validity of that confinement, are properly brought in habeas. Id. (quoting Woodall, 432 F.3d at 236, 241-44).  We interpreted those decisions to

6

authorize a very limited subset of non-"core" conditions-of-confinement habeas claims.

We held in Camacho Lopez that the petitioner's claim—that he had tested positive for the COVID-19 virus, was experiencing severe symptoms, and was being held in a facility unequipped to treat him—fell within this very limited subset. See id. at *6. Two days later, we held that another petitioner's claim—that the COVID-19 virus had been detected within his facility, that he was uniquely susceptible to severe complications if he were to contract it, and that the institution was not acting to prevent its spread—likewise constituted a sufficiently "extreme case" warranting our exercise of jurisdiction. See Verma v. Doll, No. 4:20-CV-14, 2020 WL 1814149, at *4 (M.D. Pa. Apr. 9, 2020).[4]  Buleishvili claims that his medical condition makes him particularly vulnerable to the effects of COVID-19, that his particular institution is not acting to protect him, and that he is experiencing symptoms that are consistent with COVID-19.  Such claims fall within the very limited subset of "extreme cases" contemplated by Camacho Lopez and Verma.

Respondent also argues that, if we decide to exercise jurisdiction, the remedy sought in habeas must be proportionate to the claim alleged. (See Doc. 5 at 9-11). That is, they contend that the "only appropriate remedy" for a conditions-

---

[4] Another court in this district, relying on Camacho Lopez and Verma, has since intimated that any claim based on the COVID-19 virus may qualify as an "extreme case" cognizable in habeas. See Saillant v. Hoover, No. 1:20-CV-609, 2020 WL 1891854, at *3 (M.D. Pa. Apr. 16, 2020). Given the particular facts of this case, we do not need to decide whether a generalized fear of COVID-19, when the petitioner has no comorbidities and the virus has not yet reached the petitioner's facility, is a basis for a cognizable habeas claim.

of-confinement claim is "a cure of the violative conditions," not release from those conditions. (Id. at 9). This argument has plausible merit. In Woodall, for example, the Third Circuit entertained a challenge in habeas to the Bureau of Prisons' criteria for making community corrections center placements. Id. at 241-44. But the petitioner's success on the merits of his claim did not mean that he received the ultimate habeas remedy sought—referral to a community corrections center. See id. at 251. Rather, the court said that "the appropriate remedy is an order requiring the [Bureau of Prisons] to consider—in good faith—whether or not Woodall should be transferred to a [community corrections center]." Id. Woodall suggests that something short of immediate release may be the proper remedy in similar non-"core" habeas cases. Because we conclude *infra* that Buleishvili cannot prevail on his constitutional claims, we need not reach the question of remedy today.

    **B.**    **Merits of Buleishvili's Habeas Petition**

The gravamen of Buleishvili's petition is his assertion that CCCF is not implementing adequate measures to prevent the COVID-19 virus from entering the facility or to prevent its transmission if it does reach the facility. (See Doc. 1 ¶¶ 4, 27-38). We glean two claims, both sounding in due process, from Buleishvili's petition: a claim that CCCF is subjecting him to impermissibly punitive conditions

of confinement, and a claim that CCCF is being deliberately indifferent to the risk posed by the COVID-19 virus.[5]  (Id. ¶¶ 39-46).

As to the first claim, the law in the Third Circuit is clear that a civil immigration detainee is entitled to the "same due process protections" as a pretrial detainee.  E.D. v. Sharkey, 928 F.3d 299, 306-07 (3d Cir. 2019).  An immigration detainee can bring a claim for violation of those protections when the conditions of confinement fall below constitutional minimums.  Id.  To prevail on this claim, Buleishvili must demonstrate that the conditions of confinement at CCCF amount to "punishment" lacking any reasonable relationship to "a legitimate governmental objective."  Bell v. Wolfish, 411 U.S. 520, 535, 539 (1979).  As to his second claim, Buleishvili must show that detaining officials knew or should have known of, and consciously disregarded, an excessive risk to his health and safety.  See Reynolds v. Wagner, 128 F.3d 166, 172-73 (3d Cir. 1997) (citing Boring v. Kozakiewicz, 833 F.2d 468, 472 (3d Cir. 1987)); see also Woloszyn v. County of Lawrence, 396 F.3d 314, 320-21 (3d Cir. 2005) (citations omitted).

To support both claims, Buleishvili relies almost exclusively on our colleague's decision in Thakker v. Doll, No. 1:20-CV-480, ___ F. Supp. 3d ___, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020) (Jones, J.).  In Thakker, the court ordered

---

[5] The parties frame Buleishvili's claims as arising under the Fifth and Eighth Amendments to the United States Constitution.  Because Buleishvili is a civil detainee in state custody, not a convicted prisoner, his claims are governed by the Fourteenth Amendment.  See Hubbard v. Taylor, 399 F.3d 150, 158 n.13 (3d Cir. 2005); Reynolds v. Wagner, 128 F.3d 166, 173 (3d Cir. 1997).  As these decisions reflect, the operative Fourteenth Amendment legal standards nonetheless derive from Fifth and Eighth Amendment jurisprudence and are largely identical, except as otherwise indicated herein.

temporary release of a group of medically vulnerable detainees in ICE custody—some of whom, like Buleishvili, were detained at CCCF—in hopes of mitigating their risk of contracting the COVID-19 virus. See generally id. The court found that the evidence revealed, *inter alia*, a general lack of effort to implement federal guidelines and that immediate release was the only way to protect the petitioners from the virus. See id. at *7-9; see also Hope v. Doll, No. 1:20-CV-562, Doc. 11 (M.D. Pa. Apr. 7, 2020) (Jones, J.) (same), appeal filed No. 20-1784 (3d Cir. Apr. 10, 2020).

The threshold problem with Buleishvili's position is that he relies not only on Thakker's reasoning, but also on Thakker's record. Buleishvili's petition attaches and quotes at length from two declarations submitted by the Thakker petitioners in support of their own habeas claims. (Compare Docs. 1-2, 1-3), with Thakker, No. 1:20-CV-480, Docs. 2-1, 2-2. These declarations do little to support Buleishvili's personal habeas claim. The declaration of Dr. Jonathan Louis Golob describes the COVID-19 disease and its symptoms, and it explains that some people are at higher risk of experiencing serious complications from the disease. (See Doc. 1-3 ¶¶ 2-12, 14). Dr. Golob states that the "high risk" category includes people over age 50 as well as those with certain medical conditions, including "those with lung disease, heart disease, diabetes, or immunocompromised (such as from cancer, HIV, autoimmune disease), blood disorders (including sickle cell disease), chronic liver or kidney disease, inherited metabolic disorders, stroke, developmental delay, or pregnancy." (Id. ¶ 3). Buleishvili, however, is only 44 years old, and he supplies no evidence to suggest that a spinal surgery in 2004 or a nebulous "long medical history" place him in the medically vulnerable category. (See Doc. 1 ¶¶ 1, 9, 33).

Buleishvili encounters even greater evidentiary problems with the declaration of Dr. Joseph J. Amon, which is offered to substantiate Buleishvili's claims as to the conditions of confinement at CCCF. First, the declaration is not "particularized" to this petitioner. See Verma, 2020 WL 1814149, at *5. As Judge Kane recently observed, "habeas review is entirely individual." Umarbaev v. Lowe, No. 1:20-CV-413, 2020 WL 1814157, at *7 (M.D. Pa. Apr. 9, 2020) (Kane, J.); see also Saillant v. Hoover, No. 1:20-CV-609, 2020 WL 1891854, at *4 (M.D. Pa. Apr. 16, 2020) (Wilson, J.) (habeas relief requires "individualized showing"). The conclusions that Dr. Amon reached were based solely on the experiences of the individual Thakker petitioners. (Doc. 1-2 ¶¶ 31, 35). His conclusions as to medical vulnerability were likewise unique to the Thakker petitioners. (Id. ¶¶ 11-22). We encountered this same infirmity in Verma, where we held that a petitioner could not rely exclusively on the Thakker declarations but instead must produce evidence "describ[ing] *his* conditions or *his* treatment during the COVID-19 pandemic." Verma, 2020 WL 1814147, at *5.

The second problem with Dr. Amon's now month-old declaration is that its conclusion that CCCF "do[es] not appear to be adopting" protective measures is inconsistent with our record. (Doc. 1-2 ¶ 31). Respondent has supplied evidence that CCCF *is* following federal guidance for managing COVID-19 in correctional and detention facilities. (Doc. 5-1 ¶ 7). CCCF screens all new detainees, as well as all staff and vendors, for COVID-19 symptoms. (Id. ¶¶ 9, 10, 14). It has halted all visitation except for noncontact professional visits. (Id. ¶ 16). It has protocols in place for isolating and testing symptomatic detainees and "cohorting" those who

may have been exposed to the virus. (Id. ¶ 13(a)). And it has ramped up efforts to prevent transmission within the facility, providing detainees two washable masks each, requiring staff to wear masks, installing hand sanitizer stations, cleaning and disinfecting more frequently, and educating staff and detainees about prevention and hygiene. (Id.) This evidence establishes that, even if CCCF was not taking appropriate action a month ago, it is now.

For these reasons, we reject the suggestion that we—or any court—should apply Thakker wholesale to grant relief in COVID-19 habeas cases. As the undersigned and two other judges in this district have now concluded, relief in these cases must be individualized. See Saillant, 2020 WL 1891854, at *4 (Wilson, J.); Umarbaev, 2020 WL 1814157, at *7 (Kane, J.); see also Verma, 2020 WL 1814149, at *5 (Conner, C.J.). Last week, Judge Wilson described relevant case-by-case considerations as including, but not limited to: (1) the petitioner's condition, and specifically whether the petitioner has tested positive for the virus or is exhibiting symptoms consistent with COVID-19, is known to have been directly exposed to the virus, or is at high risk of experiencing serious complications from COVID-19; (2) the detention space itself, and specifically how that space affects the risk of contracting the COVID-19 virus; and (3) the facility's efforts to prevent or mitigate detainee exposure to the virus. See Saillant, 2020 WL 1891854, at *4. We agree with this distillation of relevant factors and add one other: as pertains to any claim that detention is impermissibly punitive, we should also consider the initial basis and continued justification for the petitioner's detention.

None of these factors suggest that habeas relief is necessary in this case. Buleishvili is subject to mandatory detention pending removal due to his status as an "aggravated felon." He does not allege that he has tested positive for or been directly exposed to the COVID-19 virus. Buleishvili is 44 years old, and he has presented no evidence suggesting that his medical condition makes him uniquely susceptible to either contracting the virus or experiencing severe complications from the disease it causes. While Buleishvili describes experiencing some recent symptoms, including a cough, an incident with a bloody nose, and "something in his lungs" which adversely affects his breathing, his declaration indicates that he has ready access to and is being continuously treated by medical staff, and he does not allege that he has been denied appropriate medical care. (Doc. 6-1 ¶¶ 1-4). Indeed, medical records supplied today reveal a normal temperature and 100% oxygen saturation rate during Buleishvili's most recent visit to sick call. No CCCF detainee or staff member has tested positive for the COVID-19 virus to date. And, as detailed at length *supra*, CCCF has implemented screening measures to prevent the virus from entering the facility, prophylactic measures to prevent transmission within the facility, and mitigation plans in the event a detainee or staff member does test positive for the virus.

As we have said before, there is no perfect solution for preventing the spread of the COVID-19 virus in detention facilities. Verma, 2020 WL 1814149, at *6. But the present record establishes that CCCF is responding adequately to these difficult circumstances. See Saillant, 2020 WL 1891854, at *5 (reaching same conclusion as to CCCF). Buleishvili simply has not shown that CCCF is subjecting

13

him to punitive conditions of confinement or consciously disregarding the risk that the COVID-19 virus presents to detainee health and safety.  We therefore conclude that Buleishvili is not entitled to habeas relief.

## IV.     Conclusion

Buleishvili's petition (Doc. 1) for writ of habeas corpus will be denied.  An appropriate order shall issue.

    /S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:     April 20, 2020